### NEW YORK CANAL CO., Limited, v. BOND et al.

(Circuit Court of Appeals, Ninth Circuit. May 10, 1920. Rehearing Denied July 6, 1920.)

No. 3429.

**Waters and water courses �kö+222—Contract with Reclamation Service valid.**

A contract made under the Reclamation Act, between the United States and an irrigation company, on behalf of its stockholders, for the furnishing of additional water to the lands of such stockholders from the government reservoir, construed, and *held* valid, and to authorize the charges made against the company for maintenance and operation.

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the New York Canal Company, Limited, against J. B. Bond and Charles F. Weinkauf. Decree for defendants, and complainant appeals.. Affirmed.

C. C. Cavanah, J. B. Eldridge, and Frank T. Wyman, all of Boise, Idaho, for appellant.

B. E. Stoutmeyer and J. L. McClear, both of Boise, Idaho, for appellées.

Before GILBERT and HUNT, Circuit Judges, and VAN FLEET, District Judge.

HUNT, Circuit Judge. The Canal Company appealed from a decree in favor of the appellees upon a motion to dismiss the complaint. The Canal Company is a mutual co-operative irrigation company. Bond and Weinkauf, appellees, are project manager and fiscal agent, respectively, of the Payette-Boise Reclamation Project, and as the agents and representatives of the Secretary of the Interior of the United States are charged with the duty of managing the reclamation work of the project referred to and operating storage water fur-

nished and delivered to the landowners from Arrowrock reservoir, in Boise river, Idaho. The suit is to restrain appellees from charging and collecting from appellant and its stockholders certain charges for the year 1918, made upon the water rights of appellant and its stockholders and water right holders, and from declaring a forfeiture of certain percentage of construction charges for storage water paid appellant under a contract between appellant and the United States, made July 1, 1918. The facts as alleged in the complaint are as follows:

The vested water rights of appellant and its stockholders are the right to divert and use through the New York Canal, under an appropriation dated March 23, 1900, a certain quantity of water, and the right to have the water carried through the canal upon paying the proportion of the maintenance and operation charge for the maintenance and operation of all of the operation of the canal transferred by appellant to the United States under a contract of March 3, 1906. Appellant alleges that under the contract of March 3, 1906, an operation and maintenance charge was to be made for delivery to appellant and its shareholders for their "vested water rights" from the Boise river through the canal, then transferred by appellant to the United States, and that under the construction given to the contract by all parties the officers of the Reclamation Service delivered the vested water rights, and that for several years an operation and maintenance charge was paid according to the proportion of the operation and maintenance cost of operation for that part of the irrigation works so transferred by the appellant to the United States under the contract, but that in 1918 greater charges than the contract provided for were made by the appellees and the Reclamation Service.

In 1915, 1916, and 1917 appellant applied for water, and the agents of the United States made contracts with appellant, providing that the storage waters from the reservoir were to be furnished to the stockholders and water right holders of appellant to supplement their vested water rights during the latter part of the irrigation season, and certain charges were made each year, covering only the delivery and use of the storage water. On July 2, 1917, the Secretary of the Interior issued a public notice stating that water would be furnished after July 1st of each irrigation season to the lands of appellant and its stockholders in a specified manner, namely, that upon proof of ownership from the New York Canal Company, the water being subject to delivery by the United States under the contract of March 3, 1906, supplemental water rights would be furnished in certain quantities at $33 per acre of irrigable land, the water to be delivered after July 1st, in an amount sufficient to make the total water supply from all sources equal to the average water supply furnished after July 1st, to similar lands of the Boise project for which full water right was furnished from the project. The notice also stated that the operation and maintenance charge for delivery of water claimable on account of "said vested rights of the New York Canal Company" should be at the rates provided in the contract between the United States and the New York Canal Company, and that the operation and

maintenance charge for the delivery of "such supplemental supply from the reservoir and other works of the United States" should be at rates determinable under section 5 of the Reclamation Extension Act (Comp. St. § 4713e) and announced by public notices for the Boise Project.

It is averred that appellant and its stockholders were given to understand by the reclamation director and chief engineer, while pretending to act for the United States, but who was acting beyond the scope of his authority, and arbitrarily, that no further storage water would be delivered from the reservoir unless appellant executed before the expiration of July 1, 1918, a written contract, dated July 1, 1918, which appellant says it was forced by the then project manager and the director and chief engineer of the Reclamation Commission of the United States to enter into. The contract of July 1, 1918, was prepared by counsel for the project, and in order to secure the storage water, and to maintain crops, appellant pleads that it entered into the contract of July 1, 1918, but then insisted that the contract should only require appellant and its stockholders to pay the amount of the construction charge therein provided, and the amount of the operation and maintenance charge for the storage water furnished thereunder, and should not pay an operation and maintenance charge upon their vested water rights, as provided in the contract of March 3, 1906.

It is alleged that under paragraph 6 of the contract (hereinafter quoted) of July 1, 1918, appellant's shareholders are to continue to receive all their vested water rights at all times as they were entitled under the contract of March 3, 1906, and that all their vested water rights, if any, were reserved, except as not otherwise provided in the contract, as long as the same were available from the natural flow of Boise river, and that nothing contained in the contract of July 1, 1918, was to lessen or impair any of the vested water rights in any way unless by foreclosure; that by the contract a supplemental water right was to be a supplemental right from Arrowrock reservoir, and carried with it the right for water in an amount sufficient to make the amount of water delivered equal and similar in amount, as far as practicable, to the average water supply furnished after July 1, each year, to similar lands of the project for which full season water rights were furnished.

Paragraph 6 of the contract of July 1, 1918, is as follows:

(6) "It is understood and agreed that the shareholders and water right holders of the company are to continue to receive all the vested water rights at all times to which they are entitled under said contract of March 3, 1906, and reserve all other vested rights, if any, not otherwise provided herein, as long as the same are available from the natural flow of Boise river, and nothing herein contained shall lessen or impair any of said vested water rights in any way, unless by foreclosure of lien for nonpayment as herein provided, and it is agreed and understood that the supplemental water right herein provided to be furnished for said New York water right lands shall be a supplemental right from said Arrowrock reservoir, and the measure of the supplemental or additional water right to be furnished by the United States to said New York water right lands under this contract shall be the use and benefit of sufficient storage capacity in Arrowrock reservoir to furnish a supplemental water supply delivered after July 1st of each year in sufficient amount to make the amount of water delivered to

said New York water right lands equal and similar in amount, as nearly as reasonably practical, to the average water supply furnished after July 1st to similar lands of the Boise project for which full season water rights are furnished from said project, but in no event shall the United States be obliged to deliver such supplemental water supply for more acreage than the total contracted and paid for by the company under this contract."

## Paragraph 16 is as follows:

(16) "In addition to the construction charge herein agreed to be paid, the company will pay to the United States an annual operation and maintenance charge, which will be determined and announced each year by the Secretary of the Interior in the manner provided in section 5 of the said Reclamation Extension Act of August 13, 1914 (38 Stat. 686). For the irrigation season of 1918, and each year thereafter until further notice, the operation and maintenance charge will be forty (40) cents per acre-foot for all water delivered to or for each of the several tracts of land described in the attached orders and certificates from whatever source after July 1st of each year: Provided, that for 1918 and each year until further notice by the Secretary of the Interior, a minimum operation and maintenance charge of forty (40) cents per acre for water service after July 1st will be made for each and every irrigable acre in each of said tracts described in the attached orders and certificates, whether water be used thereon or not, and until further notice all operation and maintenance charges for each year will be due and payable on March 1st of the year following the year in which the water was delivered. If paid by the company to the United States on or before the date when due, the operation and maintenance charge for the supplemental water supply herein provided shall be subject to a discount of five (5%) per cent. as provided in section six (6) of the said act of Congress of August 13, 1914, and if not paid when due shall be subject to the penalties provided in said section 6, which said operation and maintenance charge after July 1st of each year shall cover all water delivered after July 1st out of both said supplemental and vested water rights."

Turning to the contract of March 3, 1906, referred to in paragraph 6 just quoted, we quote sections 7 and 8:

(7) "The delivery of such water reserved to the holders of said certificates of stock and contracts, and the payments for maintaining and operating the system as hereinafter provided, shall be made in accordance with the provisions of the existing by-laws of the said company and the terms of the contracts, from any existing lateral on the main canal between the point of diversion at Boise river and a point not more than five miles southwest of the crossing of such main canal by the Oregon Short Line Railroad, near Mora, and shall be given precedence over any other rights to water in said canal which may be subsequently acquired: Provided, that delivery of water represented by said certificates of stock and contracts shall be made exclusively from the unregulated flow of the Boise river and shall be limited by the amount thereof. Copies of said by-laws and contracts are hereto attached and made a part hereof: And provided further that it is expressly agreed and understood that no part of the expense for the enlargement of said canal shall be assessed against or borne by or charged to the stock of the stockholders of the said New York Canal Company, Limited."

(8) "It is further agreed that an equitable proportion of the cost of maintaining and operating the system of irrigation works which may be constructed by the United States on the south side of the Boise valley, as may be determined by the Secretary of the Interior, shall be paid to the United States by the holders of said certificates of stock. The holders of rights under said contracts with the company shall pay to the United States the cost of maintaining and operating such system of irrigation works in accordance with the terms of their said contract."

It will be observed that paragraphs 7 and 8, just quoted, pertain to the payment for maintaining and operating systems and to the proportion of the cost of maintenance and operation of the same. But the contract which controlled the delivery of stored waters from the Arrowrock reservoir was the agreement of July 1, 1918. This, we think, is plain, because that is the only agreement which relates to the delivery of stored water. Furthermore, it is under the contract of July 1, 1918, that the defendants presented a bill for maintenance charges, and it is against the payment of maintenance charges that the Canal Company objects. The contract of March 3, 1906, is properly referred to in order to arrive at the true understanding of the parties in their contract of July 1, 1918. The latter contract was made under the provisions of the Act of Congress of June 17, 1902, 32 Stat. 388 (Comp. St. §§ 4700-4708), and acts amendatory thereof, and section 2 of the Act of Congress of February 21, 1911, 36 Stat. 925 (Comp. St. § 4739), the Warren Act, which provided in substance that in carrying out the Reclamation Act the Secretary of the Interior had authority—

"upon such terms as may be agreed upon to co-operate with irrigation districts, water users' associations, * * * or water users for the construction or use of such reservoirs, canals, or ditches as may be advantageously used by the government and irrigation districts, water users' associations, * * * entrymen, * * * for impounding, delivering and carrying water for irrigation purposes."

In order, however, to obtain a better understanding of the controversy, reference should be had to section 5 of the Act of Congress of August 13, 1914, 38 Stat. 686 (Comp. St. § 4713e), which provides that, in addition to the construction charge, every water right applicant or landowner upon a reclamation project shall also pay, whenever water service is available for the irrigation of his land, an operation and maintenance charge based upon the total cost of operation and maintenance of the project or each separate unit thereof, and such charge shall be made for each acre-foot of water delivered, provided that, when an organized association shall so request, the Secretary of the Interior is authorized in his discretion to transfer the operation and maintenance of all or any part of the project works, subject to such rules and regulations as he may prescribe. Keeping these several matters in mind, and going back now to section 16, we find its provisions quite plain. In addition to the charge to be paid by the contract, the company agreed to pay an annual operation and maintenance charge, to be determined and announced by the Secretary of the Interior as provided in section 5 of the Reclamation Act of August 13, 1914, just referred to. There is also in the contract provision for the irrigation season of 1918 and each year thereafter until further notice, whereby the operation and maintenance charge would be 40 cents per acre-foot for all water delivered to the land described in a certain order after July 1st of each year; also a provision that for 1918 and each year thereafter until further notice by the Secretary of the Interior there should be a minimum operation and maintenance charge of 40 cents per acre for water service after July

1st for each and every irrigable acre in the tract described, whether water was used or not; also provision that if the company paid to the United States, on or before the date when the charge was due, the operation and maintenance charge for the supplemental water supply provided for in the contract, the payments would be subject to a discount as provided by the referred to Act of Congress of August 13, 1914, and if not paid when due penalties might be imposed as provided in section 6 of that act (Comp. St. § 4713f), and that the—

"said operation and maintenance charge after July 1st of each year shall cover all water delivered after July 1st out of both supplemental and vested water rights."

It is urged that there was nothing in the contract of July 1, 1918, which should lessen or impair any of "said vested water rights in any way except by foreclosure" as provided in the contract. But, as we read section 6, it is a specification of the water rights which the Canal Company was to have, while section 16 specifies the monetary charges for the use of the water. There was in section 6 the agreement that the water right holders of the Canal Company should continue to receive all the vested water rights to which they were entitled under the contract of 1906, and a reservation of all other vested rights, if any there were, not otherwise provided in the contract, as long as the same were available from the natural flow of Boise river. We must construe the provisions of the contract in a way to give force and validity to all of them, for it is in this way that we arrive at the true intention of the parties and are best able to give meaning and effect to their language. By using the words "not otherwise provided herein," appearing in section 6, the parties intended to make it clear that nothing in section 6 should nullify the specific provisions of other sections of the contract. In this way we recognize the rights, not only reserved by section 6, but those which are conferred by the other provisions of the agreement. The words of limitation, whereby the Canal Company should receive water rights "as long as the same are available from the natural flow of Boise river," are evidence that the parties referred to the use of water, not to a right to a particular maintenance charge or operation tax.

We find ourselves in accord with the view of the learned judge of the District Court, who held that the language of section 6 is not out of harmony with the import of section 16, and that the Canal Company in executing the new agreement was careful to guard existing vested rights. Paragraph 16, pertaining to payments for the specified maintenance charge for all water delivered from whatever source after July 1st of each year, appears to have been a part of the consideration agreed upon for granting the supplemental and stored water right referred to in section 5. As said, however, by the District Court:

"The substantive right is something quite different from the matter of the expense of maintaining the facilities for its enjoyment."

Even the contract of 1906, heretofore referred to, by section 8, provided for payment of an equitable proportion, as determined by the

Secretary of the Interior, of the cost of operation and maintenance of the entire system of irrigation works to be constructed for the United States on the south side of Boise valley; it was not merely an agreement to pay a share of the cost of maintaining the works turned over to the United States by the company. Niday v. Barker, 16 Idaho, 73, 101 Pac. 254; Coburn v. Wilson, 24 Idaho, 104, 132 Pac. 579. There would necessarily be an operation and maintenance charge for delivery of water, whether delivered from a right already vested or acquired by supplementary agreement.

We do not perceive that there is any injustice in the result of the holding that the company should pay the charge agreed to be paid and required to be paid. The Canal Company and its stockholders have obtained a very valuable right, which greatly adds to the value of their land holdings. Experience may have proved that it would be more satisfactory to obtain uniform maintenance rates applicable to all waters delivered after July 1st, from whatever source, and that, by making an agreement accordingly, difficulties in determining just what part of the water delivered to each stockholder would come out of the vested rights of the company and what part would come out of the rights of the United States would be obviated.

Reference to the offer contained in the public notice of the Secretary of the Interior is not required, in view of the fact that the parties agreed upon a rate of 40 cents per acre-foot as the maintenance rate in 1918 for all water delivered after July 1st. Had they not agreed to that rate, it would have been the duty of the Secretary of the Interior in his judgment to fix a rate to be charged to the shareholders of the company. Indeed, under section 8 of the contract of 1906, as well as section 16 of the contract of July 1, 1918, the parties agreed that the Secretary of the Interior should determine the charge to be made, and it is reasonable to say that under the Reclamation Extension Act of August 13, 1914, authority is placed in the Secretary of the Interior to fix charges where the parties have not agreed upon them. Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; Houston v. St. Louis Independent Packing Co., 249 U. S. 479, 39 Sup. Ct. 332, 63 L. Ed. 717.

In considering the contract of 1918 it is to be noticed that there was no obligation on the Canal Company to purchase supplemental waters from the Arrowrock reservoir. Had not the company desired to purchase, it could have preserved its vested rights, and thus would have continued to receive what water it had received before the United States constructed the Arrowrock reservoir. They did not elect to pursue this course, and chose to avail themselves of the benefits of the Arrowrock reservoir, and in order to secure such additional rights, the company assumed the obligations of the provisions of the contract of July 1, 1918.

The complaint that the charge made is excessive is without solid foundation, for the rate was agreed upon, and section 5 of the Act of August 13, 1914, hereinbefore cited, requires that each acre of ground, whether irrigated or not, shall be charged with a minimum

operation and maintenance charge, based upon the charge for delivery of not less than one acre-foot of water.

Little need be said as to the assertion of the Canal Company that it was compelled to sign the contract of July 1, 1918. If the company construed the contract as it is now contended it should be construed, its rights were carefully protected. Nor is the plea of duress of serious moment, for the company does not ask for a cancellation, but for a construction, of the contract.

The decree is affirmed.